**ORIGINAL**

UNITED STATES DISTRICT COURT

DS 1667

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

**3-06CV1110.-M**

| | |
|---|---|
| ALASKA ELECTRICAL FUND, Derivatively on Behalf of AFFILIATED COMPUTER SERVICES, §§§§ | Civil Action No. |
| Plaintiff, §§ | DEMAND FOR JURY TRIAL |
| vs. §§ | |
| JEFFREY RICH, JOSEPH P. O'NEILL, FRANK A. ROSSI, DARWIN DEASON, MARK KING, LYNN BLODGETT, J. LIVINGSTON KOSBERG, DENNIS MCCUISTION, WARREN EDWARDS, JOHN REXFORD and JOHN M. BROPHY, §§§§§§§§ | |
| Defendants, §§ | |
| – and – §§ | |
| AFFILIATED COMPUTER SERVICES, INC, a Delaware corporation, §§§ | |
| Nominal Defendant. §§ | |



U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

JUN 2 2 2006

CLERK, U.S. DISTRICT COURT
By _____
Deputy

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, CONSTRUCTIVE FRAUD, CORPORATE WASTE, UNJUST ENRICHMENT, GROSS MISMANAGEMENT, BREACH OF CONTRACT AND ACTION FOR ACCOUNTING**

## SUMMARY AND OVERVIEW OF THE ACTION

1.      This is a shareholder derivative action on behalf of Nominal Defendant Affiliated

Computer Services, Inc. ("ACS" or the "Company") against its entire Board of Directors and certain

top officers for violations of federal and state law, including breaches of fiduciary duty, abuse of

control, constructive fraud, corporate waste, unjust enrichment and gross mismanagement which

have caused damage to ACS.  This action arises out of Defendants' causing or permitting the

backdating of stock option grants to and for the benefit of ACS's directors and top executive

officers, including the Company's former Chief Executive Officer Jeffrey Rich ("Rich"), and/or

failed to properly investigate whether these grants had been improperly made.   Each of the

Defendants also participated in the concealment of the backdating option scheme complained of

herein and/or refused to take advantage of the Company's legal rights to require these insiders to

disgorge the illicitly obtained incentive compensation and proceeds diverted to them since at least

1995. Each of the Defendants either knew of the backdating and were participants in the fraudulent

and unlawful conduct or should have known of this conduct and done more about it.

2.      Stock option grants give recipients a right to buy company stock at a set price, called

the exercise price or strike price.  The right usually does not vest for a year or more, but then it

continues for several years.  The exercise price is usually the stock's closing price on the date of

grant.  Obviously, the lower the exercise price, the more money the recipient can potentially make

some day by exercising the options.

3.      On March 18, 2006, in an article entitled *The Perfect Payday: Some CEOs Reap

Millions By Landing Stock Options When They Are Most Valuable; Luck – Or Something Else?*, *The

Wall Street Journal* published an analysis of stock options granted to select chief executive officers

and directors of several companies, including ACS and Defendant Rich.  According to *The Wall

Street Journal's* analysis, six options that were granted to Defendant Rich between 1995 and 2002

were dated just before a rise in the stock price or at the bottom of a steep drop.  With regard to the

option backdating scheme at ACS, *The Wall Street Journal* stated, in pertinent part, as follows:

> On a summer day in 2002, shares of Affiliated Computer Services Inc. sank to their lowest level in a year.  Oddly, that was good news for Chief Executive Jeffrey Rich.
>
> His annual grant of stock options was dated that day, entitling him to buy stock at that price for years.  Had they been dated a week later, when the stock was 27% higher, they'd have been far less rewarding.  It was the same through much of Mr. Rich's tenure: In a striking pattern, all six of his stock-option grants from 1995 to 2002 were dated just before a rise in the stock price, often at the bottom of a steep drop.
>
> Just lucky?  *A Wall Street Journal analysis suggests the odds of this happening by chance are extraordinarily remote -- around one in 300 billion.*  The odds of winning the multistate Powerball lottery with a $1 ticket are one in 146 million.
>
> Suspecting such patterns aren't due to chance, the Securities and Exchange Commission is examining whether some option grants carry favorable grant dates for a different reason: They were backdated.  The SEC is understood to be looking at about a dozen companies' option grants with this in mind.
>
>                          *   *   *
>
> *Mr. Rich called his repeated favorable option-grant dates at ACS "blind luck."  He said there was no backdating, a practice he termed "absolutely wrong."*  A spokeswoman for ACS, Lesley Pool, disputed the Journal's analysis of the likelihood of Mr. Rich's grants all falling on such favorable dates.  *But Ms. Pool added that the timing wasn't purely happenstance: "We did grant options when there was a natural dip in the stock price," she said.  On March 6, ACS said that the SEC is examining its option grants.*
>
>                          *   *   *
>
> While most of Mr. Rich's stock-option gains were due to rises in ACS stock, the exceptional timing of grants enhanced his take.  If his grants from 1995 through 2002 had come at each year's average share price, rather than the favorable dates, he'd have made about 15% less.
>
> An especially well-timed grant, in which Mr. Rich received 500,000 options at $11.53, adjusted for stock splits, was dated Oct. 8, 1998.  This happened to be the bottom of a steep plunge in the price.  The shares fell 28% in the 20 trading days prior to Oct. 8, and rose 60% in the succeeding 20 trading days.
>
> ACS's Ms. Pool said the grant was for Mr. Rich's promotion to CEO.  He wasn't promoted until February 1999.  Ms. Pool said there was a "six-month transition plan," and the Oct. 8 option grant was "in anticipation" of his promotion.

Mr. Rich would have fared far worse had his grant come on the day ACS announced his promotion. The stock by then was more than twice as high. The grant wasn't reported to the SEC until 10 months after the stated grant date. Ms. Pool said that was proper under regulations in place at the time.

A special board committee oversaw Mr. Rich's grants. Most years, its sole members were directors Frank Rossi and Joseph O'Neill. Mr. Rossi declined to comment. *Mr. O'Neill said, "We had ups and downs in our stock price like any publicly traded stock. If there were perceived low points, would we grant options at that point? Yes."*

Mr. Rich said grants were made on the day the compensation committee authorized them, or within a day or so of that. He said he or Chairman Darwin Deason made recommendations to the special board committee about option dates.

Mr. Rich, who is 45 years old, resigned abruptly as ACS's chief executive on a Thursday in September to "pursue other business interests." Again, his timing was advantageous. *In an unusual separation agreement, the company agreed to make a special payment of $18.4 million, which was equal to the difference between the exercise price of 610,000 of his outstanding stock options and the closing ACS stock price on the day of his resignation.*

But the company didn't announce the resignation that day. On the news the next Monday that its CEO was departing suddenly, the stock fell 6%. *Mr. Rich netted an extra $2 million by cashing in the options before the announcement, rather than on the day of it.*

Mr. Rich said ACS signed his separation agreement on Friday, using Thursday's price for the options payout. He said it waited till Monday to release the news because it didn't want to seem "evasive" by putting the news out late Friday. [Emphasis added.]

4.      Backdating the date of issuance of Defendant Rich's stock option grants, as well as those of other top ACS executives' stock options not only violated ACS's publicly disclosed stock option plans, which provided that incentive stock option grants be priced at not less than the fair market value of the price of ACS common stock, which is the stock's closing price on the date of the grant, but it also was in breach of Defendants' fiduciary duties of good faith, fair dealing and loyalty to ACS.

5.      Defendants' conduct has unjustly enriched ACS's top executives, including Defendant Rich, to the detriment of ACS and its public shareholders. A key purpose of stock options is to give recipients an incentive to improve their employer's performance, including its

stock price. Backdating them so they carry a lower price runs counter to this goal, giving the recipient a "paper profit" right from the start. For example, if a company grants options on May 22, when its stock price is $20, but records the date of issue as April 22, when the stock price was only $15, it would be giving those who were granted options a "sure thing."

6.      Due to Defendants' conduct, ACS has been exposed to a costly investigation by the United States Securities and Exchange Commission ("SEC"), as well as to potential costly and expensive lawsuits for violations of the federal securities laws and accounting rules applicable to public companies. As *The Wall Street Journal* explained:

> Companies have a right to give executives lavish compensation if they choose to, but they can't mislead the shareholders about it. Granting an option at a price below the current market value, while not illegal in itself, could result in false disclosure. That's because companies grant their options under a shareholder-approved "option plan" on file with the SEC. The plans typically say options will carry the stock price of the day the company awards them or the day before. If it turns out they carry some other price, the company could be in violation of its options plan, and potentially vulnerable to an allegation of securities fraud.

> It could even face accounting issues. Options priced below the stock's fair value when they're awarded bring the recipient an instant paper gain. Under accounting rules, that's equivalent to extra pay and thus is a cost to the company. A company that failed to include such cots in its books may have overstated its profits, and might need to restate past financial results.

7.      Professor Stephen Bainbridge (www.professorbainbridge.com), Professor of Corporate Law at UCLA, agrees:

> There's nothing inherently illegal about either paying large compensation or even backdating an option contract, so long as proper corporate procedures were followed and the grant does not amount to a waste of corporate assets. Where public corporations are concerned, however, failure to disclose the backdating likely would constitute securities fraud. In particular, failure to do so probably would constitute a material omission with respect to the executive compensation disclosures required in the proxy statement for the corporation's annual meeting.

> Stephen Bainbridge, *Option Grant Timing*, March 18, 2006
> http:www.professorbainbridge.com/2006/03/index.html.

8.      Moreover, as a result of Defendants' conduct, the Company's proxy materials that have been filed with the SEC are false and misleading, the Company may be liable for illegal insider

trading, the Company may be in violation of certain provisions of the Internal Revenue Code since it may not be able to deduct the options payments from its taxable income and the Company has been forced to take a $40 million charge because it improperly accounted for its option grants subsequent to its initial public offering in 1994 through December 31, 2005.

9.      By this action, Plaintiff seeks to recover damages and other relief against Defendants for the severe injuries their misconduct has inflicted upon ACS.

### JURISDICTION AND VENUE

10.     The claims asserted herein arise under §§10(b), 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78j(b), 78n(a) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder, and under Texas law for violations of breach of fiduciary duty, abuse of control, constructive fraud, waste of corporate assets, unjust enrichment and gross mismanagement. In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail and the facilities of a national securities market.

11.     This Court has subject matter jurisdiction pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1331. This Court also has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367.

12.     Venue is proper in this district pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. ACS is located in and conducts its business in this District.

### THE PARTIES

13.     Plaintiff Alaska Electrical Fund is a current shareholder of ACS.

14.     Nominal Defendant ACS is a Delaware corporation with its executive offices and principal place of business located in Dallas, Texas.  ACS provides business process and information technology outsourcing solutions to commercial and government clients.  Defendant ACS may be served with process at 2828 North Haskell, Dallas, Texas 75204.

15.     Defendant Rich was a Director of ACS from August 1991 until September 2005.  He was Chief Executive Officer of ACS from February 1999 until September 2005.  From April 1995 until August 2002, he was President of ACS.  As a member of the Board of Directors, he caused or permitted the backdated stock options described herein to be granted.  He has also personally benefited from the backdated stock options as described herein.  Moreover, because of Defendant Rich's position, he was aware of non-public information about the business of ACS, as well as its finances, markets and present and future business prospects.  He also had access to internal corporate documents, conversations and connections with other corporate officers and employees, and attended Board meetings.  During the relevant period, Rich participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings.  Defendant Rich may be served with process at 2828 North Haskell, Dallas, Texas 75204.

16.     Defendant Joseph P. O'Neill ("O'Neill") has been a Director of ACS since November 1994.  He has been a member of the Special Compensation Committee Compensation[1] and its successor, the Compensation Committee (collectively, "Compensation Committee") since August 1996.  As a member of the Board of Directors and the Compensation Committee, he caused or permitted the backdated stock options described herein to be granted.  Moreover, because of

---

[1]     The Special Compensation Committee was responsible for reviewing the compensation of the executive officers whose compensation exceeded $1 million, by reviewing salaries, recommending bonuses and other forms of additional compensation, including grants of awards under the 1988 and the 1997 Stock Incentive Plans.

- 6 -

Defendant O'Neill's position, he was aware of non-public information about the business of ACS, as well as its finances, markets and present and future business prospects. He also had access to internal corporate documents, conversations and connections with other corporate officers and employees, and attended Board meetings. During the relevant period, O'Neill participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings. Defendant O'Neill may be served with process at 2828 North Haskell, Dallas, Texas 75204.

17.    Defendant Frank A. Rossi ("Rossi") has been a Director of ACS since November 1994. He was a member of the Compensation Committee between July 1997 and September 2003. As a member of the Board of Directors and the Compensation Committee, he caused or permitted the backdated stock options described herein to be granted. Moreover, because of Defendant Rossi's position, he was aware of non-public information about the business of ACS, as well as its finances, markets and present and future business prospects. He also had access to internal corporate documents, conversations and connections with other corporate officers and employees, and attended Board meetings. During the relevant period, Rossi participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings. Defendant Rossi may be served with process at 2828 North Haskell, Dallas, Texas 75204.

18.    Defendant Darwin Deason ("Deason") has been Chairman of ACS since September 1988. From September 1998 until February 1999, Deason was Chief Executive Officer of ACS. He was a member of the Compensation Committee between August 1996 and September 2003. As a member of the Board of Directors and the Compensation Committee, he caused or permitted the backdated stock options described herein to be granted. He has also personally benefited from the backdated stock options as described herein. Moreover, because of Defendant Deason's position, he was aware of non-public information about the business of ACS, as well as its finances, markets and

present and future business prospects. He also had access to internal corporate documents, conversations and connections with other corporate officers and employees, and attended Board meetings. During the relevant period, Deason participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings. Defendant Deason may be served with process at 2828 North Haskell, Dallas, Texas 75204.

19.     Defendant J. Livingston Kosberg ("Kosberg") has been a Director of ACS since September 2003. He has been a member of the Compensation Committee since September 2003. As a member of the Board of Directors and the Compensation Committee, Defendant Kosberg knew non-public information about the business of ACS, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the relevant period, Kosberg participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings. Defendant Kosberg may be served with process at 2828 North Haskell, Dallas, Texas 75204.

20.     Defendant Mark King ("King") has been a Director of ACS since October 1996. He has been President and Chief Executive Officer of ACS since September 2005. From August 2002 until September 2005, he was President and Chief Operating Officer of ACS; from March 2001 until August 2002, he was Chief Operating Officer of ACS; and from May 1995 until March 2001, he was Executive Vice President and Chief Financial Officer of ACS since May 1995. As a member of the Board of Directors, he caused or permitted the backdated stock options described herein to be granted. He has also personally benefited from the backdated stock options as described herein. Moreover, because of Defendant King's position, he was aware of non-public information about the business of ACS, as well as its finances, markets and present and future business prospects. He also

had access to internal corporate documents, conversations and connections with other corporate officers and employees, and attended Board meetings.  During the relevant period, King participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings.  Defendant King may be served with process at 2828 North Haskell, Dallas, Texas 75204.

21.     Defendant Lynn Blodgett ("Blodgett") has been a Director and Executive Vice President and Chief Operating Officer of ACS since September 2005.  From July 1999 until September 2005, he was Executive Vice President and Group President of Commercial Solutions of ACS.  He caused or permitted the backdated stock options described herein to be granted.  He has also personally benefited from the backdated stock options as described herein.  Because of Defendant Blodgett's position, she knew non-public information about the business of ACS, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the relevant period, Blodgett participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings.  Defendant Blodgett may be served with process at 2828 North Haskell, Dallas, Texas 75204.

22.     Defendant Dennis McCuistion ("McCuistion") has been a Director of ACS since September 2003.  As a member of the Board of Directors, Defendant McCuistion knew non-public information about the business of ACS, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the relevant

period, McCuistion participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings. Defendant McCuistion may be served with process at 2828 North Haskell, Dallas, Texas 75204.

23.     Defendant Warren Edwards ("Edwards") has been Executive Vice President and Chief Financial Officer of ACS since March 21, 2001. He caused or permitted the backdated stock options described herein to be granted. He has also personally benefited from the backdated stock options as described herein. Moreover, because of his position, Defendant Edwards knew non-public information about the business of ACS, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the relevant period, Edwards participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings. Defendant Edwards may be served with process at 2828 North Haskell, Dallas, Texas 75204.

24.     Defendant John Rexford ("Rexford") has been Executive Vice President of Corporate Development of ACS since March 2001. He has personally benefited from the backdated stock options as described herein. He also caused or permitted the backdated stock options described herein to be granted. Moreover, because of his position, Defendant Rexford knew non-public information about the business of ACS, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the relevant period, Rexford participated in the issuance of false and/or misleading statements, including the

preparation of false and/or misleading press releases and SEC filings. Defendant Rexford may be served with process at 2828 North Haskell, Dallas, Texas 75204.

25.     Defendant John M. Brophy ("Brophy") has been Executive Vice President of Business Relations of ACS since May 2005. From August 2001 until May 2005, he was Executive Vice President and Group President of State and Local Solutions of ACS. He has personally benefited from the backdated stock options as described herein. Defendant Brophy knew non-public information about the business of ACS, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the relevant period, Brophy participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and SEC filings. Defendant Brophy may be served with process at 2828 North Haskell, Dallas, Texas 75204.

## DUTIES OF ACS'S OFFICERS AND DIRECTORS

26.     By reason of their positions as ACS's directors and officers, and because of their ability to control the Company's business and affairs, Defendants owed and owe ACS fiduciary duties of good faith, fair dealing and loyalty, and were and are required to use their utmost ability to control and manage ACS in a fair, just, honest, and equitable manner. Defendants were and are required to act in furtherance of the best interests of ACS so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

27.     Each director and officer of the Company owes to ACS the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as directors and/or officers of a public company, Defendants had a duty to promptly disseminate

accurate and truthful information with regard to the Company's financial performance and financial results so that the market price of the Company's stock would be based on truthful and accurate information.  Defendants, because of their positions of control and authority as directors and/or officers of ACS, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their senior positions with ACS, Defendants, and each of them, had access to adverse nonpublic information about the unlawful stock option backdating practices and procedures described herein.

28.     At all relevant times, Defendants, and each of them, were agents of the other Defendants and of ACS, and were at all times acting within the course and scope of such agency.

29.     To discharge their duties, ACS's directors and officers were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of ACS were required to, among other things:

(a)     prevent ACS's top executives from granting backdated stock options;

(b)     prevent ACS's Compensation Committee from granting backdated stock options;

(c)     refrain from acting upon material inside corporate information to benefit themselves;

(d)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(e)     prudently protect the Company's assets, including taking all necessary steps to recover corporate assets (cash, stock options) improperly paid to Company executives and directors

together with the related costs (professional fees) proximately caused by the illegal conduct described herein;

(f)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(g)     remain informed as to how ACS conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with the applicable federal and state corporation and/or securities laws; and

(h)     ensure that the Company is operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

## AIDING AND ABETTING AND CONCERTED ACTION

30.     In committing the wrongful acts particularized herein, Defendants have pursued or joined in the pursuit of a common course of conduct, and have acted in concert with one another in furtherance of their common plan or design.  In addition to the wrongful conduct particularized herein as giving rise to primary liability, Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

31.     At all relevant times, Defendants collectively and individually initiated a course of conduct which was designed to and did: (i) conceal the fact that the Company was over-paying its directors, officers and employees via backdated stock option grants; (ii) maintain Defendants' directorial and executive positions at ACS and the profits, power and prestige which Defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including shareholders of ACS, regarding Defendants' management of ACS's operations, the Company's financial health and

stability, and future business prospects, which had been misrepresented by Defendants throughout the relevant period. In furtherance of this course of conduct, Defendants collectively and individually took the actions set forth herein.

32.     Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs detailed herein. In taking such actions to substantially assist the commission of the wrongdoing detailed herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

33.     ACS provides diversified business process outsourcing and information technology services and solutions to commercial and governmental clients worldwide. Between 1995 and 2005, ACS grew rapidly from a small technology firm into one with more than $4.4 billion in annual revenues. Based in Dallas, Texas, ACS has over 54,000 employees based in Texas and elsewhere.

34.     According to *The Wall Street Journal*, between 1995 and 2005, ACS, through the actions of its Board of Directors and its Compensation Committee, granted stock options for the purchase of millions of shares of the Company's common stock to its top executives, including to many of the Directors and senior ACS officers named as Defendants herein.

35.     In its public filings with the SEC, including in shareholder approved stock option plans, ACS represented that the exercise price of all of the incentive stock options would be not less than the fair market value of the price of ACS common stock, which is the stock's closing price on the date of the grant. For example, the 1988 Stock Option Plan, as amended August 5, 1997, provides, in relevant part, as follows:

> The per share exercise price for the Shares to be issued pursuant to exercise of an Option shall be the price as is determined by the Board, but shall be subject to the following:

(i)      In the case of an Incentive Stock Option

                              *      *      *

(B)     granted to an Employee, the per Share exercise price shall be no less than 100% of the Fair Market Value per Share on the date of grant. . . .

36.      Under the 1988 Stock Option Plan, as amended August 5, 1997, if ACS common stock is listed on any established stock exchange or a national market system, "Fair Market Value" "shall be the closing sales price of such stock (or the closing bid, if no sales were reported, as quoted on such system or exchange for the last market trading day prior to the time of determination) as reported in *The Wall Street Journal* or such other source as the Administrator deems reliable . . . ."

37.      The 1997 Stock Incentive Plan similarly provides, in pertinent part, as follows:

The per share exercise price for the Shares to be issued pursuant to exercise of an Option shall be the price as is determined by the Board, but shall be subject to the following:

(i)      In the case of an Incentive Stock Option

                              *      *      *

(B)     granted to an Employee, the per Share exercise price shall be no less than 100% of the Fair Market Value per Share on the date of grant. . . .

38.      Contrary to the foregoing public disclosures, the options granted under these plans were highly favorable to the option recipients because the stock options were not granted at the "fair market value" on the date of grant but were in fact backdated.  In many instances, the grant dates were allegedly dated just before a sharp increase in the trading price of ACS stock or at the bottom of a steep drop in stock's price.  In fact, according to ACS's spokeswoman Lesley Pool, stock option grants to ACS's executives were given "when there was a natural dip in the stock price."  Defendant O'Neill, who served on ACS's Compensation Committee at all relevant times, confirmed this practice, stating: "We had ups and downs in our stock price like any publicly traded stock.  If there were perceived low points, would we grant options at that point?  Yes."

39.     The practice of backdating options at ACS, and many other companies, commenced prior to the passage of the Sarbanes-Oxley Act of 2002 ("Sarbanes"), when options grants did not have to be reported to the SEC until 45 days after the close of the fiscal year in which the options were granted.  Sarbanes amended a section of the Exchange Act and required insiders to file notification of grants within two business days of their receipt.

40.     Defendants took advantage of the pre-Sarbanes rules to perpetrate their scheme.  In most years, Defendants Rich and Deason made recommendations to the Special Compensation Committee about stock option grants, and then a combination of Defendants O'Neill, Rossi and Deason would authorize them as members of ACS's Compensation Committee.  Hence, Defendants retained unusual control over the grant dates and a procedure that increased the risk for backdating stock options granted to ACS's executives.

41.     Taking advantage of his position as a high-executive, Defendant Rich caused and received six grants between 1995 and 2002 at lows in the Company's stock price.  For example:

(a)     ACS made one stock option grant to Rich in 1995, a grant of 444,100 options purportedly on March 9, 1995.  On March 9, 1995, ACS stock closed at $5.63, near the bottom of a sharp drop in the price of ACS common stock, and preceding a sharp price increase.  ACS stock traded in a range from a low of $5.09 to a high of $9.53 during 1995;



Affiliated Computer Services
February 9, 1995 - April 10, 1995

(b)     ACS made one stock option grant to Rich in 1996, a grant of 400,000 options

purportedly on March 8, 1996.  On March 8, 1996, ACS stock closed at $8.44, at the bottom of a

sharp drop in the price of ACS common stock, and preceding a sharp price increase.  ACS stock

traded in a range from a low of $8.44 to a high of $15.88 during 1996;

- 17 -



**Affiliated Computer Services**

**February 8, 1996 - April 8, 1996**

(c)      ACS made one stock option grant to Rich in 1997, a grant of 120,000 options

purportedly on April 7, 1997.  On April 7, 1997, ACS stock closed at $10.57, near the bottom of a

sharp dip in the price of ACS common stock, and preceding a sharp price increase.  ACS stock

traded in a range from a low of $9.81 to a high of $15.00 in 1997;



**Affiliated Computer Services**

March 7. 1997 - May 7. 1997

(d)      ACS made one stock option grant to Rich in 1998, a grant of 500,000 options purportedly on October 8, 1998. On October 8, 1998, ACS stock closed at $11.53, at the bottom of a sharp dip in the price of ACS common stock, and preceding a sharp price increase. ACS stock traded in a range from a low of $11.53 to a high of $22.50 during 1998;



**Affiliated Computer Services**

**September 8, 1998 - November 9, 1998**

(e)      ACS made one stock option grant to Rich in 2000, a grant of 200,000 options purportedly on July 11, 2000.  On July 11, 2000, ACS stock closed at $16.44, near the bottom of a sharp dip in the price of ACS common stock, and preceding a sharp price increase.  ACS stock traded in a range from a low of $15.66 to a high of $30.75 during 2000; and



**Affiliated Computer Services**

**June 9, 2000 - August 11, 2000**

(f)　　ACS made one stock option grant to Rich in 2002, a grant of 400,000 options purportedly on July 23, 2002.  On July 23, 2002, ACS common stock closed at $35.75, near the bottom of a sharp dip in the price of ACS common stock, and preceding a sharp increase.  ACS stock traded in a range from a low of $33.88 to a high of $56.75 during 2002.





42.      According to *The Wall Street Journal*, the statistical likelihood of the options granted

to Rich from 1995 to 2002 occurring by chance on the dates when the prices of ACS stock was so

low, and hence so favorable to Rich, would be one in 300 billion:

> For instance, Affiliated Computers Services Inc. reported an option grant to its then-
> president, Jeffrey Rich, dated Oct. 8, 1998. In the succeeding 20 trading days – equal
> to roughly a month – ACS stock rose 60.2%. That huge gain was the best 20-
> trading-day performance all year for ACS. So the Journal ranked Oct. 8 No. 1 for
> ACS for 1998.
>
> It is very unlikely that several grants spread over a number of years would fall on
> high-ranked days.
>
> But all six of Mr. Rich's did. Another of his option grants also fell on the No. 1-
> ranked day of the year, March 9, 1995. Two grants fell on the second-ranked day,
> those in 1996 and 1997. In 2002, his options grant was on the third-ranked day of
> the year, and in 2000, his grant came on the fourth-ranked day.

*      *      *

For Mr. Rich's grants, the Journal's methodology puts the overall odds of a chance occurrence at about one in 300 billion – less likely than flipping a coin 38 times and having it come up "heads" every time.

43.     Other ACS directors and top executives also received improperly backdated stock option grants, including Defendants Deason, Blodgett, King, Edwards, Rexford, and Brophy.  For example:

(a)     on April 7, 1997, ACS purportedly made a grant of 80,000 options to King. On April 7, 1997, ACS stock closed at $10.57, near the bottom of a sharp drop in the price of ACS common stock, and preceding a sharp price increase.  ASC stock traded in a range from a low of $9.81 to a high of $15.00 during 1997;



(b)     on May 18, 1998, ACS purportedly made a grant of 40,000 options to King. On May 18, 1998, ACS stock closed at $15.94, at the bottom of a sharp drop in the price of ACS

common stock, and preceding a sharp price increase.  ASC stock traded in a range from a low of

$11.53 to a high of $22.50 during 1998;



**Affiliated Computer Services**

**April 17. 1998 - June 18. 1998**

(c)      on October 8, 1998, ACS purportedly made a grant of 100,000 options to

King.  On October 8, 1998, ACS stock closed at $11.53, at the bottom of a sharp drop in the price of

ACS common stock, and preceding a sharp price increase.  ASC stock traded in a range from a low

of $11.53 to a high of $22.50 during 1998;

- 24 -



**Affiliated Computer Services**

September 8. 1998 - November 9. 1998

(d)      on September 13, 1999, ACS purportedly made a grant of 50,000 options to

King.  On September 13, 1999, ACS stock closed at $19.50, on unusually high trading volume and at

the bottom of a sharp drop in the price of ACS common stock.  ASC stock soon traded at $23 per

share;



**Affiliated Computer Services**

**August 13. 1999 - October 13. 1999**

(e)      on July 11, 2000, ACS purportedly made a grant of 100,000 options to King, a grant of 30,000 options to Edwards, and a grant of 30,000 options to Rexford.  On July 11, 2000, ACS stock closed at $16.44, near the bottom of a sharp dip in the price of ACS common stock, and preceding a sharp price increase.  ACS stock traded in a range from a low of $15.66 to a high of $30.75 during 2000;



**Affiliated Computer Services**

**June 9. 2000 - August 11. 2000**

(f)     on July 23, 2002, ACS purportedly made a grant of 600,000 options to Deason, a grant of 200,000 options to Edwards, a grant of 75,000 options to Blodgett, a grant of 75,000 options to Brophy, and a grant of 50,000 options to Edwards.  On July 23, 2002, ACS stock closed at $35.75, near the bottom of a sharp drop in the price of ACS common stock, and preceding a sharp price increase.  ASC stock traded in a range from a low of $33.88 to a high of $56.75 during 2002.



**Affiliated Computer Services**

**June 21, 2002 - August 23, 2002**

44.     As a result of the backdating of stock options issued to Defendant Rich and ACS's

other top insiders, Defendants have been unjustly enriched at the expense of ACS, which has

received and will receive less money from Defendants when they exercise their options at prices

substantially lower than they would have if the options had not been backdated.  These windfall

profits have made Defendant Rich, as well as the other Defendants, some of the highest paid

executives in the business process outsourcing industry.

45.     Moreover, throughout the relevant period Defendants Blodgett, Deason, Edwards,

King, O'Neill, Rexford, Rich and Rossi exercised many of these stock options permitting them to

sell over $207 million worth of ACS stock they obtained.  The details of their stock sales are set

forth in the chart below:

| Defendants | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| LYNN BLODGETT | 8/7/2000 | 120,000 | $23.00 | $2,760,000 |

- 28 -

| | | | | |
|---|---|---|---|---|
| | 5/29/2001 | 20,000 | $35.50 | $710,000 |
| | 3/31/2003 | 5,000 | $45.00 | $225,000 |
| | 4/2/2003 | 75,000 | $45.27 | $3,395,250 |
| | 6/8/2004 | 70,000 | $50.12 | $3,508,400 |
| | 6/23/2004 | 30,000 | $52.00 | $1,560,000 |
| | 9/1/2004 | 60,000 | $55.00 | $3,300,000 |
| Total: | | 380,000 | | $15,458,650 |
| | | | | |
| DARWIN DEASON | 7/8/1998 | 41,200 | $19.25 | $793,100 |
| | 7/8/1998 | 8,800 | $19.31 | $169,928 |
| | 7/9/1998 | 1,039,750 | $19.00 | $19,755,250 |
| | 11/19/1998 | 6,800 | $19.06 | $129,608 |
| | 4/23/2003 | 18,000 | $50.00 | $900,000 |
| | 5/6/2003 | 182,000 | $50.00 | $9,100,000 |
| | 5/13/2003 | 20,000 | $52.36 | $1,047,200 |
| | 5/20/2003 | 5,000 | $50.00 | $250,000 |
| | 12/2/2003 | 800 | $53.43 | $42,744 |
| | 12/12/2003 | 10,000 | $53.15 | $531,500 |
| | 12/12/2003 | 8,000 | $53.10 | $424,800 |
| | 12/12/2003 | 7,000 | $53.00 | $371,000 |
| | 12/12/2003 | 5,000 | $53.06 | $265,300 |
| | 12/12/2003 | 5,000 | $53.12 | $265,600 |
| | 12/12/2003 | 5,000 | $53.17 | $265,850 |
| | 12/12/2003 | 5,000 | $53.27 | $266,350 |
| | 12/12/2003 | 5,000 | $53.35 | $266,750 |
| | 12/12/2003 | 4,000 | $53.11 | $212,440 |
| | 12/12/2003 | 2,000 | $53.08 | $106,160 |
| | 12/12/2003 | 200 | $53.45 | $10,690 |
| | 11/26/2004 | 144,100 | $60.01 | $8,647,441 |
| | 11/29/2004 | 25,000 | $60.00 | $1,500,000 |
| | 12/6/2004 | 17,000 | $60.00 | $1,020,000 |
| | 12/7/2004 | 419,200 | $60.18 | $25,227,456 |
| Total: | | 1,983,850 | | $71,569,167 |
| | | | | |
| WARREN EDWARDS | 5/21/2002 | 30,000 | $55.22 | $1,656,600 |
| | 5/21/2002 | 20,000 | $55.22 | $1,104,400 |
| | 5/19/2003 | 50,000 | $50.53 | $2,526,500 |
| | 9/13/2004 | 40,000 | $55.96 | $2,238,400 |
| | 9/14/2004 | 10,000 | $55.58 | $555,800 |
| Total: | | 150,000 | | $8,081,700 |
| | | | | |
| MARK KING | 4/30/2001 | 80,028 | $35.56 | $2,845,796 |
| | 5/21/2002 | 80,000 | $55.22 | $4,417,600 |
| | 5/21/2002 | 2,000 | $54.70 | $109,400 |
| | 5/29/2002 | 2,000 | $55.20 | $110,400 |
| | 6/4/2002 | 2,000 | $53.76 | $107,520 |
| | 6/11/2002 | 2,000 | $54.94 | $109,880 |
| | 6/18/2002 | 2,000 | $54.08 | $108,160 |
| | 11/7/2002 | 26,000 | $50.00 | $1,300,000 |
| | 11/25/2002 | 16,000 | $50.00 | $800,000 |
| | 11/27/2002 | 4,000 | $50.00 | $200,000 |
| | 12/4/2002 | 200,050 | $50.00 | $10,002,500 |
| | 12/19/2002 | 4,000 | $50.00 | $200,000 |
| | 12/24/2002 | 2,000 | $50.95 | $101,900 |

| | | | | |
|---|---|---|---|---|
| | 12/31/2002 | 2,000 | $52.45 | $104,900 |
| | 1/7/2003 | 2,000 | $55.55 | $111,100 |
| | 1/14/2003 | 2,000 | $54.80 | $109,600 |
| | 1/22/2003 | 2,000 | $51.91 | $103,820 |
| | 1/28/2003 | 2,000 | $51.80 | $103,600 |
| | 4/23/2003 | 3,000 | $50.00 | $150,000 |
| | 5/6/2003 | 25,000 | $50.00 | $1,250,000 |
| | 5/13/2003 | 2,000 | $52.55 | $105,100 |
| | 5/20/2003 | 1,000 | $50.00 | $50,000 |
| | 1/2/2004 | 10,300 | $55.20 | $568,560 |
| | 1/2/2004 | 4,900 | $55.40 | $271,460 |
| | 1/2/2004 | 4,600 | $55.15 | $253,690 |
| | 1/2/2004 | 3,000 | $55.00 | $165,000 |
| | 1/2/2004 | 3,000 | $55.03 | $165,090 |
| | 1/2/2004 | 100 | $55.25 | $5,525 |
| | 1/2/2004 | 100 | $55.47 | $5,547 |
| | 1/5/2004 | 10,000 | $56.00 | $560,000 |
| | 1/6/2004 | 2,000 | $56.82 | $113,640 |
| | 1/13/2004 | 2,000 | $56.50 | $113,000 |
| | 1/21/2004 | 2,000 | $55.41 | $110,820 |
| | 1/30/2004 | 2,000 | $55.10 | $110,200 |
| | 4/20/2004 | 5,000 | $55.00 | $275,000 |
| | 9/1/2004 | 800 | $54.76 | $43,808 |
| | 9/1/2004 | 600 | $54.76 | $32,856 |
| | 9/1/2004 | 600 | $54.75 | $32,850 |
| | 9/2/2004 | 24,000 | $54.82 | $1,315,680 |
| | 9/2/2004 | 6,000 | $54.75 | $328,500 |
| | 9/2/2004 | 2,700 | $54.75 | $147,825 |
| | 9/2/2004 | 1,300 | $54.76 | $71,188 |
| | 9/14/2004 | 2,000 | $55.75 | $111,500 |
| | 9/21/2004 | 2,000 | $57.07 | $114,140 |
| | 9/28/2004 | 2,000 | $54.75 | $109,500 |
| | 10/4/2004 | 50,000 | $60.08 | $3,004,000 |
| | 10/5/2004 | 2,000 | $60.14 | $120,280 |
| | 10/12/2004 | 2,000 | $57.85 | $115,700 |
| | 10/19/2004 | 2,000 | $57.12 | $114,240 |
| | 11/1/2004 | 2,000 | $54.75 | $109,500 |
| | 11/2/2004 | 2,000 | $54.95 | $109,900 |
| | 11/9/2004 | 2,000 | $57.81 | $115,620 |
| | 11/16/2004 | 2,000 | $59.18 | $118,360 |
| | 11/23/2004 | 2,000 | $59.31 | $118,620 |
| | 11/30/2004 | 2,000 | $59.32 | $118,640 |
| | 12/7/2004 | 2,000 | $60.13 | $120,260 |
| | 12/14/2004 | 2,000 | $59.40 | $118,800 |
| | 12/21/2004 | 2,000 | $58.11 | $116,220 |
| | 12/28/2004 | 2,000 | $59.88 | $119,760 |
| | 1/4/2005 | 2,000 | $58.13 | $116,260 |
| | 1/11/2005 | 2,000 | $57.89 | $115,780 |
| | 1/19/2005 | 2,000 | $56.33 | $112,660 |
| **Total:** | | **636,078** | | **$32,391,255** |
| | | | | |
| JOSEPH P. O'NEILL | 1/29/2001 | 20,000 | $32.00 | $640,000 |
| | 11/29/2002 | 40,000 | $50.08 | $2,003,200 |
| **Total:** | | **60,000** | | **$2,643,200** |

| | | | | |
|---|---|---|---|---|
| JOHN REXFORD | 4/27/2001 | 4,000 | $35.50 | $142,000 |
| | 3/13/2002 | 75,000 | $52.15 | $3,911,250 |
| | 3/14/2002 | 10,000 | $54.00 | $540,000 |
| | 3/18/2002 | 7,500 | $54.90 | $411,750 |
| | 3/18/2002 | 7,500 | $55.11 | $413,325 |
| | 10/22/2003 | 10,000 | $48.20 | $482,000 |
| | 10/27/2003 | 40,000 | $48.50 | $1,940,000 |
| | 9/13/2004 | 70,000 | $56.00 | $3,920,000 |
| | 9/14/2004 | 30,000 | $55.71 | $1,671,300 |
| Total: | | 254,000 | | $13,431,625 |
| | | | | |
| JEFFREY RICH | 8/2/1996 | 50,000 | $13.93 | $696,500 |
| | 11/12/1998 | 10,000 | $19.22 | $192,200 |
| | 5/17/1999 | 12,000 | $19.97 | $239,640 |
| | 8/4/2000 | 90,000 | $24.26 | $2,183,400 |
| | 10/27/2000 | 71,200 | $27.92 | $1,987,904 |
| | 10/30/2000 | 28,800 | $27.52 | $792,576 |
| | 4/25/2001 | 25,800 | $34.67 | $894,486 |
| | 4/26/2001 | 74,200 | $34.68 | $2,573,256 |
| | 5/23/2001 | 100,000 | $35.81 | $3,581,000 |
| | 7/3/2001 | 4,000 | $36.20 | $144,800 |
| | 7/10/2001 | 4,000 | $36.15 | $144,600 |
| | 7/17/2001 | 4,000 | $38.00 | $152,000 |
| | 7/24/2001 | 4,000 | $39.65 | $158,600 |
| | 7/31/2001 | 4,000 | $42.75 | $171,000 |
| | 8/7/2001 | 4,000 | $39.16 | $156,640 |
| | 8/14/2001 | 4,000 | $40.85 | $163,400 |
| | 8/21/2001 | 4,000 | $41.18 | $164,720 |
| | 8/28/2001 | 4,000 | $43.01 | $172,040 |
| | 10/2/2001 | 4,000 | $39.55 | $158,200 |
| | 10/9/2001 | 4,000 | $43.70 | $174,800 |
| | 10/16/2001 | 4,000 | $44.40 | $177,600 |
| | 10/23/2001 | 4,000 | $46.15 | $184,600 |
| | 10/30/2001 | 4,000 | $44.75 | $179,000 |
| | 11/5/2001 | 100,000 | $46.15 | $4,615,000 |
| | 11/6/2001 | 4,000 | $46.40 | $185,600 |
| | 11/13/2001 | 4,000 | $45.75 | $183,000 |
| | 11/20/2001 | 4,000 | $48.00 | $192,000 |
| | 11/27/2001 | 4,000 | $47.60 | $190,400 |
| | 12/4/2001 | 4,000 | $47.00 | $188,000 |
| | 12/11/2001 | 4,000 | $48.50 | $194,000 |
| | 12/18/2001 | 4,000 | $50.50 | $202,000 |
| | 12/26/2001 | 4,000 | $51.72 | $206,880 |
| | 1/2/2002 | 4,000 | $52.14 | $208,560 |
| | 1/8/2002 | 4,000 | $52.60 | $210,400 |
| | 1/16/2002 | 4,000 | $53.47 | $213,880 |
| | 1/22/2002 | 4,000 | $51.50 | $206,000 |
| | 1/29/2002 | 4,000 | $44.92 | $179,680 |
| | 2/5/2002 | 4,000 | $46.16 | $184,640 |
| | 2/12/2002 | 4,000 | $46.80 | $187,200 |
| | 2/19/2002 | 4,000 | $47.07 | $188,280 |
| | 2/26/2002 | 4,000 | $46.42 | $185,680 |
| | 3/5/2002 | 4,000 | $51.35 | $205,400 |

| | | | | |
|---|---|---|---|---|
| | 3/12/2002 | 4,000 | $52.18 | $208,720 |
| | 3/19/2002 | 4,000 | $56.00 | $224,000 |
| | 3/26/2002 | 4,000 | $53.50 | $214,000 |
| | 4/2/2002 | 4,000 | $55.76 | $223,040 |
| | 4/9/2002 | 4,000 | $53.63 | $214,520 |
| | 4/16/2002 | 4,000 | $50.55 | $202,200 |
| | 4/23/2002 | 4,000 | $54.06 | $216,240 |
| | 4/30/2002 | 4,000 | $54.07 | $216,280 |
| | 5/7/2002 | 4,000 | $52.01 | $208,040 |
| | 5/14/2002 | 4,000 | $52.64 | $210,560 |
| | 5/21/2002 | 4,000 | $54.78 | $219,120 |
| | 5/28/2002 | 4,000 | $55.70 | $222,800 |
| | 6/4/2002 | 4,000 | $53.63 | $214,520 |
| | 6/11/2002 | 4,000 | $54.55 | $218,200 |
| | 6/18/2002 | 4,000 | $53.82 | $215,280 |
| | 6/25/2002 | 4,000 | $46.73 | $186,920 |
| | 7/3/2002 | 4,000 | $45.00 | $180,000 |
| | 7/9/2002 | 4,000 | $46.75 | $187,000 |
| | 7/17/2002 | 4,000 | $46.17 | $184,680 |
| | 7/30/2002 | 8,000 | $45.41 | $363,280 |
| | 8/6/2002 | 4,000 | $45.00 | $180,000 |
| | 8/13/2002 | 4,000 | $48.00 | $192,000 |
| | 8/20/2002 | 4,000 | $48.15 | $192,600 |
| | 8/27/2002 | 4,000 | $46.25 | $185,000 |
| | 9/4/2002 | 4,000 | $45.00 | $180,000 |
| | 9/10/2002 | 4,000 | $46.75 | $187,000 |
| | 9/17/2002 | 4,000 | $46.50 | $186,000 |
| | 10/3/2002 | 4,000 | $39.22 | $156,880 |
| | 10/21/2002 | 16,000 | $45.00 | $720,000 |
| | 10/22/2002 | 4,000 | $45.00 | $180,000 |
| | 10/22/2002 | 4,000 | $45.41 | $181,640 |
| | 10/29/2002 | 4,000 | $45.41 | $181,640 |
| | 11/5/2002 | 4,000 | $48.10 | $192,400 |
| | 11/12/2002 | 4,000 | $48.15 | $192,600 |
| | 11/20/2002 | 4,000 | $45.00 | $180,000 |
| | 11/26/2002 | 4,000 | $48.93 | $195,720 |
| | 12/10/2002 | 4,000 | $48.60 | $194,400 |
| | 12/24/2002 | 4,000 | $52.67 | $210,680 |
| | 12/31/2002 | 4,000 | $52.50 | $210,000 |
| | 1/7/2003 | 4,000 | $55.50 | $222,000 |
| | 1/14/2003 | 4,000 | $54.85 | $219,400 |
| | 1/21/2003 | 4,000 | $52.60 | $210,400 |
| | 1/28/2003 | 4,000 | $50.46 | $201,840 |
| | 2/4/2003 | 4,000 | $50.00 | $200,000 |
| | 2/11/2003 | 4,000 | $46.10 | $184,400 |
| | 2/19/2003 | 2,000 | $47.75 | $95,500 |
| | 2/25/2003 | 2,000 | $45.00 | $90,000 |
| | 3/4/2003 | 2,000 | $45.10 | $90,200 |
| | 3/11/2003 | 2,000 | $41.75 | $83,500 |
| | 3/18/2003 | 2,000 | $46.35 | $92,700 |
| | 3/19/2003 | 2,000 | $46.35 | $92,700 |
| | 3/25/2003 | 2,000 | $46.73 | $93,460 |
| | 4/1/2003 | 2,000 | $44.26 | $88,520 |
| | 4/8/2003 | 2,000 | $41.95 | $83,900 |

|  | 4/15/2003 | 2,000 | $42.80 | $85,600 |
|---|---|---|---|---|
|  | 4/15/2003 | 2,000 | $42.80 | $85,600 |
|  | 4/15/2003 | 2,000 | $42.80 | $85,600 |
|  | 4/22/2003 | 2,000 | $46.10 | $92,200 |
|  | 4/29/2003 | 2,000 | $48.20 | $96,400 |
|  | 5/6/2003 | 2,000 | $49.35 | $98,700 |
|  | 5/13/2003 | 2,000 | $52.54 | $105,080 |
|  | 5/20/2003 | 2,000 | $49.90 | $99,800 |
|  | 5/28/2003 | 2,000 | $47.00 | $94,000 |
|  | 6/3/2003 | 2,000 | $48.45 | $96,900 |
|  | 6/10/2003 | 2,000 | $46.70 | $93,400 |
|  | 6/17/2003 | 2,000 | $48.10 | $96,200 |
|  | 6/24/2003 | 2,000 | $45.75 | $91,500 |
|  | 12/15/2003 | 48,100 | $53.24 | $2,560,844 |
|  | 4/30/2004 | 150,000 | $48.49 | $7,273,500 |
|  | 5/25/2004 | 32,000 | $50.00 | $1,600,000 |
|  | 5/26/2004 | 12,300 | $50.00 | $615,000 |
|  | 6/4/2004 | 4,000 | $50.00 | $200,000 |
|  | 6/7/2004 | 51,700 | $50.05 | $2,587,585 |
|  | 9/9/2004 | 100,000 | $55.02 | $5,502,000 |
|  | 12/14/2005 | 88,042 | $55.14 | $4,854,636 |
|  | 12/14/2005 | 992 | $55.14 | $54,699 |
| **Total:** |  | **1,417,134** |  | **$60,515,286** |
|  |  |  |  |  |
| FRANK A. ROSSI | 8/29/2001 | 10,000 | $42.50 | $425,000 |
|  | 1/24/2003 | 25,000 | $51.41 | $1,285,250 |
|  | 1/21/2004 | 25,000 | $55.32 | $1,383,000 |
| **Total:** |  | **60,000** |  | **$3,093,250** |
|  |  |  |  |  |
| **Grand Total:** |  | **4,304,984** |  | **207,184,132** |

46.     The practice of backdating stock options not only lines the pockets of ACS's directors and executives at the direct expense of the Company, which dollar for dollar receives money when the options are exercised, but also has caused the Company to take a $40 million charge because it improperly accounted for its option grants subsequent to its initial public offering in 1994 through December 31, 2005. This is because options priced below the stock's fair market value when they are awarded bring the recipient an instant paper gain. Under accounting rules, that is the equivalent of additional compensation and thus must be treated as a cost to the Company. ACS did not account as an expense the amount by which the market price of the Company's stock on the actual date the options were issued exceeded the exercise price of the options and thus the Defendants' conduct described herein may have caused ACS to materially overstate its publicly reported financial results.

47.     Defendants, who were and/or are directors and/or officers of ACS, with a fiduciary duty to act with the utmost good faith and loyalty, either expressly authorized the practice of backdating stock options or, in conscious disregard of their fiduciary duties, made no effort to seek recompense to the Company.  Moreover, Defendants Deason, Kosberg, Rossi and O'Neill served on the Compensation Committee of the ACS Board of Directors at all relevant times.  The Committee was responsible for overseeing the details of ACS's compensation, employee benefits and stock options plans.  The Compensation Committee also was responsible for administering and reviewing ACS's executive compensation and incentive compensation programs.  Defendants Deason, Kosberg, Rossi and O'Neill, in violation of their duties as members of the Compensation Committee, gave undeserved compensation to Defendant Rich and others rather than remaining truly independent and completely unbiased.

48.     The practice of backdating stock option grants to certain ACS's Directors and top executives remained undisclosed to investors and the SEC until March 18, 2006 when *The Wall Street Journal* published an analysis of stock options granted to Defendant Rich.  With regard to the option backdating scheme at ACS, *The Wall Street Journal* stated, in pertinent part, as follows:

> On a summer day in 2002, shares of Affiliated Computer Services Inc. sank to their lowest level in a year.  Oddly, that was good news for Chief Executive Jeffrey Rich.
>
> His annual grant of stock options was dated that day, entitling him to buy stock at that price for years.  Had they been dated a week later, when the stock was 27% higher, they'd have been far less rewarding.  It was the same through much of Mr. Rich's tenure: In a striking pattern, all six of his stock-option grants from 1995 to 2002 were dated just before a rise in the stock price, often at the bottom of a steep drop.
>
> Just lucky?  *A Wall Street Journal analysis suggests the odds of this happening by chance are extraordinarily remote -- around one in 300 billion.*  The odds of winning the multistate Powerball lottery with a $1 ticket are one in 146 million.
>
> Suspecting such patterns aren't due to chance, the Securities and Exchange Commission is examining whether some option grants carry favorable grant dates for a different reason: They were backdated.  The SEC is understood to be looking at about a dozen companies' option grants with this in mind.

\*          \*          \*

***Mr. Rich called his repeated favorable option-grant dates at ACS "blind luck." He said there was no backdating, a practice he termed "absolutely wrong."*** A spokeswoman for ACS, Lesley Pool, disputed the Journal's analysis of the likelihood of Mr. Rich's grants all falling on such favorable dates. But Ms. Pool added that the timing wasn't purely happenstance: "We did grant options when there was a natural dip in the stock price," she said. On March 6, ACS said that the SEC is examining its option grants.

\*          \*          \*

While most of Mr. Rich's stock-option gains were due to rises in ACS stock, the exceptional timing of grants enhanced his take. If his grants from 1995 through 2002 had come at each year's average share price, rather than the favorable dates, he'd have made about 15% less.

An especially well-timed grant, in which Mr. Rich received 500,000 options at $11.53, adjusted for stock splits, was dated Oct. 8, 1998. This happened to be the bottom of a steep plunge in the price. The shares fell 28% in the 20 trading days prior to Oct. 8, and rose 60% in the succeeding 20 trading days.

ACS's Ms. Pool said the grant was for Mr. Rich's promotion to CEO. He wasn't promoted until February 1999. Ms. Pool said there was a "six-month transition plan," and the Oct. 8 option grant was "in anticipation" of his promotion.

Mr. Rich would have fared far worse had his grant come on the day ACS announced his promotion. The stock by then was more than twice as high. The grant wasn't reported to the SEC until 10 months after the stated grant date. Ms. Pool said that was proper under regulations in place at the time.

A special board committee oversaw Mr. Rich's grants. Most years, its sole members were directors Frank Rossi and Joseph O'Neill. Mr. Rossi declined to comment. Mr. O'Neill said, "We had ups and downs in our stock price like any publicly traded stock. If there were perceived low points, would we grant options at that point? Yes."

Mr. Rich said grants were made on the day the compensation committee authorized them, or within a day or so of that. He said he or Chairman Darwin Deason made recommendations to the special board committee about option dates.

49.     *The Wall Street Journal* further revealed the proceeds reaped by Defendant Rich on

his well-timed resignation:

Mr. Rich, who is 45 years old, resigned abruptly as ACS's chief executive on a Thursday in September to "pursue other business interests." Again, his timing was advantageous. ***In an unusual separation agreement, the company agreed to make a special payment of $18.4 million, which was equal to the difference between the***

*exercise price of 610,000 of his outstanding stock options and the closing ACS
stock price on the day of his resignation.*

But the company didn't announce the resignation that day. On the news the next
Monday that its CEO was departing suddenly, the stock fell 6%. *Mr. Rich netted an
extra $2 million by cashing in the options before the announcement, rather than
on the day of it.*

Mr. Rich said ACS signed his separation agreement on Friday, using Thursday's
price for the options payout. He said it waited till Monday to release the news
because it didn't want to seem "evasive" by putting the news out late Friday.
[Emphasis added.]

50.     On April 27, 2006, the Company conducted a conference call with analysts. With

regard to the recent news concerning the alleged backdating scheme at ACS, Mark King, President

& CEO of ACS, stated, in pertinent part, as follows:

> Our Compensation Committee has not been opposed to granting stock options when
> our stock price appeared low relative to its trading history, and in some cases grants
> have been made when natural dips have occurred in our stock price. The
> Compensation Committee recognizes that meaningful incentives granted through
> stock options to key executives is critical to building the overall long-term market
> value of ACS. And one final point. I would just remind everyone that relative to our
> peers, ACS has one of the lowest percentages of compensation expense and dilution
> resulting from stock options. Furthermore, until just last year, stock options were not
> exercisable, even if vested, until five years after grant. We are not aware of any
> other public company that has such stringent exercise limitations.
>
> *         *         *
>
> Our internal investigation is not complete; but based on the information we have
> gathered and what we know at this point, I offer the following: First, we do not
> believe that there has been any intentional granting of look-back stock options to
> executive officers and directors, and we believe our grants have complied with the
> terms of our stock options plan. Of course, this matter is subject to resolution of the
> SEC investigation, as well as our ongoing internal investigation. And second, as we
> have previously said, we do not believe the allegations in the shareholder lawsuit
> have merit, and we intend to vigorously defend the case.

51.     On May 10, 2006, the Company announced that it would be delaying the filing of its

first quarter financial results with the SEC. Contrary to previous reports, the Company now admitted

that certain of its options were dated prior to when they became effective. As a result, the Company

now announced that it would take a $40 million charge for compensation expenses that were not

properly accounted for in prior periods.  With regard to the delay, the Company revealed, in

pertinent part, as follows:

> At the direction of the Company's Board of Directors, in response to the informal SEC investigation noted above, ACS has commenced an internal investigation through its regular outside counsel into the Company's historical stock option practices, including a review of the Company's underlying option grant documentation and procedures. Due to the volume of data subject to this review, the Company is unable to complete and file by the prescribed due date its Quarterly Report on Form 10-Q for the fiscal quarter ended March 31, 2006 without unreasonable effort or expense.
>
> \* \* \*
>
> *Historically, the Company has granted stock options principally utilizing a process whereby its compensation committee or special compensation committee, as applicable, would approve stock option grants through unanimous written consents with specified effective dates that generally preceded the date on which the consents had been executed by all members of the applicable compensation committee.*  In connection with option grants to senior executives, the historical practice was for the Company's chairman, who during periods prior to September 2003 was also a member of the Company's compensation committee, to engage, on a relatively contemporaneous basis with the effective date specified in the written consent, in individual telephonic discussions with each of the members of the applicable compensation committee, during which the committee member would indicate his approval of the option grants in question. In connection with significant acquisitions, the Company's historical practice was for its Board of Directors (including members of the applicable compensation committee) to consider during board meetings convened for the purpose of approving an acquisition the proposed stock option component that would be designated to an acquisition target's management team, with a unanimous written consent of the applicable compensation committee to follow at a later time with a specified effective date for the option grants in question.
>
> Based on its option grant procedures, the Company has historically considered the effective date specified in the written consents by the applicable compensation committee as the accounting measurement date for determining stock-based compensation expense under APB 25 and SFAS 123®. *However, the Company has determined, in consultation with its independent public accounting firm, that the proper accounting measurement date for stock option awards cannot precede the date on which the grants were approved through the execution of written consents or through a valid meeting of the applicable compensation committee.*  Notwithstanding the Company's accounting determination noted above, the Company believes that (i) its historical written consent effective date process is permitted under the Company's current and predecessor stock option plans and Delaware corporate law, (ii) the Company has consistently followed this process in prior accounting periods, and (iii) in many cases, the grants in question had been

verbally discussed and approved by each of the members of the applicable compensation committee on a relatively contemporaneous basis with the specified effective date of those grants.

Accordingly, based on the preliminary results of its review of the Company's historical stock option practices, including its underlying option grant documentation and procedures, and the initial findings of its internal investigation (which is on-going and not complete as of the date of this filing), *the Company has preliminarily determined that it will record a cumulative prior period non-cash stock-based compensation expense charge in an amount that is not presently anticipated to exceed approximately $40 million. This charge relates to certain of the option grants covering approximately 24 million common shares (after giving effect to forfeitures of option grants covering approximately 7 million common shares) by the Company subsequent to its initial public offering in 1994 and through December 31, 2005.* During this same period, the Company recorded a cumulative pre-tax profit of approximately $3.5 billion. At this time, ACS is unable to determine the final amount of such adjustment or whether such adjustment will require a restatement of prior period financial statements or will be reflected in its third quarter 2006 results of operations. Such determinations will be made prior to the Company's filing of its Form 10-Q for the third quarter ended March 31, 2006. The Company is also evaluating the impact of this matter on its internal control over financial reporting and related report thereon as of June 30, 2005 as well as its disclosure controls and procedures. In that regard, the Company intends to revise its stock option grant procedures so that all future grants are contemporaneously approved in formal meetings of the compensation committee.

52.    Then, on May 17, 2006, the Company received a grand jury document subpoena issued by the U.S. District Court for the Southern District of New York requesting that the Company produce documents relating to the granting of stock options from 1998 through the present.

53.    As ACS's directors and/or top officers, Defendants stood in a fiduciary relationship with the Company's shareholders, and had a duty to disclose their practice of backdating stock options for certain ACS executives. In violation of that duty, Defendants unlawfully concealed the fact that the options granted to Defendant Rich, among others, were backdated and made affirmative misrepresentations to the contrary.

54.    Defendants misrepresented and caused the Company to misrepresent in public SEC filings that the stock options were priced at not less than the fair market value of the stock on the date of grant, thereby affirmatively concealing the claims set forth herein. The shareholder approved

stock option plans were exhibits that were incorporated by reference each year in ACS's SEC annual reports, which often times, Defendants personally signed under penalty of perjury. Defendants' misrepresentations about their stock option pricing practices were known to be false and were made in reckless disregard of its truth or falsity, and the concealment could not have been discovered through reasonable diligence by the typical shareholder.

## THE STOCK OPTION BACKDATING SCHEME AND ITS IMPACT ON ACS'S FINANCIAL STATEMENTS

**The 1996 Form 10-K405**

55.     ACS's financial results for the fiscal fourth quarter and year end of 1996, the period ended June 30, 1996, were reported in the Company's Report on Form 10-K405 filed with the SEC on or about September 30, 1996. The annual report was signed by Defendants King, Deason, Rich, O'Neill and Rossi, among others. The 1996 Form 10-K405 was simultaneously distributed to shareholders and the public. The 1996 Form 10-K included ACS's 1996 financial statement which were materially false and misleading and presented in violation of U.S. Generally Accepted Accounting Principles ("GAAP"), due to improper accounting for the backdated stock options. As a result, ACS's compensation expense was understated and its net earnings were overstated.

**The 1997 Form 10-K405**

56.     ACS's financial results for the fiscal fourth quarter and year end of 1997, the period ended June 30, 1997, were reported in the Company's Report on Form 10-K405 filed with the SEC on or about September 29, 1997. The annual report was signed by Defendants King, Deason, Rich, O'Neill and Rossi, among others. The 1997 Form 10-K405 was simultaneously distributed to shareholders and the public. The 1997 Form 10-K405 included ACS's 1997 financial statement which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, ACS's compensation expense was understated and its net earnings were overstated.

**The 1998 Form 10-K405**

57.     ACS's financial results for the fiscal fourth quarter and year end of 1998, the period ended June 30, 1998, were reported in the Company's Report on Form 10-K405 filed with the SEC on or about September 28, 1998. The annual report was signed by Defendants King, Deason, Rich, O'Neill and Rossi, among others. The 1998 Form 10-K405 was simultaneously distributed to shareholders and the public. The 1998 Form 10-K405 included ACS's 1998 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, ACS's compensation expense was understated and its net earnings were overstated.

**The 1999 Form 10-K405**

58.     ACS's financial results for the fiscal fourth quarter and year end of 1999, the period ended June 30, 1999, were reported in the Company's Report on Form 10-K405 filed with the SEC on or about September 28, 1999. The annual report was signed by Defendants King, Deason, Rich, O'Neill and Rossi, among others. The 1999 Form 10-K405 was simultaneously distributed to shareholders and the public. The 1999 Form 10-K405 included ACS's 1999 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, ACS's compensation expense was understated and its net earnings were overstated.

**The 2000 Form 10-K405**

59.     ACS's financial results for the fiscal fourth quarter and year end of 2000, the period ended June 30, 2000, were reported in the Company's Report on Form 10-K405 filed with the SEC on or about September 28, 2000. The annual report was signed by Defendants King, Deason, Rich, O'Neill and Rossi, among others. The 2000 Form 10-K405 was simultaneously distributed to shareholders and the public. The 2000 Form 10-K405 included ACS's 2000 financial statements

which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, ACS's compensation expense was understated and its net earnings were overstated.

**The 2001 Form 10-K405**

60.     ACS's financial results for the fiscal fourth quarter and year end of 2001, the period ended June 30, 2001, were reported in the Company's Report on Form 10-K405 filed with the SEC on or about August 27, 2001. The annual report was signed by Defendants Edwards, King, Deason, Rich, O'Neill and Rossi, among others. The 2001 Form 10-K405 was simultaneously distributed to shareholders and the public. The 2001 Form 10-K405 included ACS's 2001 financial statements which were materially false and misleading and presented in violation of GAAP, due to its improper accounting for the backdated stock options. As a result, ACS's compensation expense was understated and its net earnings were overstated.

**The 2002 Form 10-K**

61.     ACS's financial results for the fiscal fourth quarter and year end of 2002, the period ended June 30, 2002, were reported in the Company's Report on Form 10-K filed with the SEC on or about September 18, 2002. The annual report was signed by Defendants Edwards, King, Deason, Rich, O'Neill and Rossi, among others. The 2002 Form 10-K was simultaneously distributed to shareholders and the public. The 2002 Form 10-K included ACS's 2002 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, ACS's compensation expense was understated and its net earnings were overstated.

**The 2003 Form 10-K**

62.     ACS's financial results for the fiscal fourth quarter and year end of 2003, the period ended June 30, 2003, were reported in the Company's Report on Form 10-K filed with the SEC on

or about September 17, 2003. The annual report was signed by Defendants Edwards, King, Deason, Rich, O'Neill, Rossi, Kosberg and McCuistion. The 2003 Form 10-K was simultaneously distributed to shareholders and the public. The 2003 Form 10-K included ACS's 2003 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, ACS's compensation expense was understated and its net earnings were overstated.

**The 2004 Form 10-K**

63.    ACS's financial results for the fiscal fourth quarter and year end of 2004, the period ended June 30, 2004, were reported in the Company's Report on Form 10-K filed with the SEC on or about September 13, 2004. The annual report was signed by Defendants Edwards, King, Deason, Rich, O'Neill, Rossi, Kosberg and McCuistion, among others. The 2004 Form 10-K was simultaneously distributed to shareholders and the public. The 2004 Form 10-K included ACS's 2004 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, ACS's compensation expense was understated and its net earnings were overstated.

**The 2005 Form 10-K**

64.    ACS's financial results for the fiscal fourth quarter and year end of 2005, the period ended June 30, 2005, were reported in the Company's Report on Form 10-K filed with the SEC on or about September 13, 2005. The annual report was signed by Defendants Edwards, King, Deason, Rich, O'Neill, Rossi, Kosberg and McCuistion, among others. The 2005 Form 10-K was simultaneously distributed to shareholders and the public. The 2005 Form 10-K included ACS's 2005 financial statements which were materially false and misleading and presented in violation of GAAP, due to its improper accounting for the backdated stock options. As a result, ACS's compensation expense was understated and its net earnings were overstated.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

65.     Plaintiff incorporates ¶¶1-64.

66.     Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights.

67.     The Board of Directors of ACS currently consists of the following Defendants: Deason, King, Blodgett, Kosberg, McCuistion, O'Neill, and Rossi. All of the Board members either authorized and approved the backdating stock option grants at issue here or should have known of the backdating stock option grants and conducted an investigation prior to the disclosure on March 18, 2006. Plaintiff did not make a demand on the Board of ACS to bring this action on behalf of the Company because such a demand would have been a useless and futile act and, therefore, is excused, for the following reasons:

(a)     there was no basis or justification for backdating stock options.  It was designed solely to benefit certain of the Defendants in a manner that was inconsistent with their fiduciary duties of good faith, fair dealing and loyalty to ACS, and the Company's public disclosures, to the detriment of ACS.  Consequently, the transaction constituted a waste of corporate assets, and could not have been the product of the proper exercise of business judgment by Defendants;

(b)     between 1995 and 2002, Defendants Deason, King, and Blodgett were recipients of the stock options, which Plaintiff alleges were backdated.  Because Deason, King, and Blodgett received a personal financial benefit from the challenged transaction, they are interested in the outcome of this litigation, and therefore, a demand upon them is futile;

(c)     as members of the Compensation Committee, Defendants Deason, O'Neill and Rossi were at relevant times responsible for administering and managing ACS's executive compensation program and stock option plans.  As members of the Compensation Committee,

- 43 -

Deason, O'Neill and Rossi, at various times, authorized and enabled, or through conscious disregard,

permitted ACS to backdate stock options issued to Defendant Rich and other ACS top executives.

By such actions, Defendants Deason, O'Neill and Rossi breached their fiduciary duties of good faith,

fair dealing and loyalty to ACS. The backdating of stock options was in direct violation of the stock

option plans. The practice has been described by Defendant Rich himself as "absolutely wrong."

Based upon the foregoing, it is doubtful that the backdating of options was the product of Defendants

Deason, O'Neill and Rossi's proper exercise of business judgment and therefore demand is futile and

excused.;

(d)     the members of ACS's Board have demonstrated their unwillingness and/or

inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their

fellow directors and allies in the top ranks of the corporation for the violations of law complained of

herein. These are people they have developed professional relationships with, who are their friends

and with whom they have entangling financial alliances, interests and dependencies, and therefore,

they are not able to and will not vigorously prosecute any such action;

(e)     all of the Defendants authorized the filing of Proxy Statements, in support of

their nomination as Directors, which failed to disclose that the Defendants' stock option grants had

been backdated. They also authorized the filing of shareholder approved stock option plans, which

misrepresented that the options carry the stock price of the day of the award. Any suit by

Defendants to remedy the wrongs complained of herein would expose them to a substantial

likelihood of liability for securities and proxy violations, as well as breach of fiduciary duty.

Therefore, they are hopelessly conflicted in making a supposedly independent determination of a

demand that they cause the Company to bring this action;

(f)     All of the Defendants signed ACS's SEC annual reports at various times

between 1995 and 2004, which contained ACS's financial results, which failed to account for the

backdated stock options as compensation and an expense to the Company. As a result, the Company

has taken a $40 million charge because it improperly accounted for its option grants subsequent to its

initial public offering in 1994 through December 31, 2005. Moreover, those financial statements

may need to be restated. Any suit by Defendants to remedy the wrongs complained of herein would

expose them to a substantial likelihood of liability for securities and proxy violations, as well as

breach of fiduciary duty. Therefore, they are hopelessly conflicted in making a supposedly

independent determination of a demand that they cause the Company to bring this action; and

      (g)     all of the Defendants participated in, approved, or through a conscious failure

to act or abdication of duty, permitted the wrongs alleged herein to have occurred and participated in

efforts to conceal or disguise those wrongs from ACS's shareholders and/or acting with negligence,

gross negligence or recklessness disregarded the wrongs complained of herein, and therefore are not

disinterested parties in the outcome of this litigation.

68.    Demand upon the shareholders of ACS would be futile and is excused because ACS

is a publicly traded corporation with more than 119 million common shares issued and outstanding

and tens of thousands of shareholders scattered throughout the county. Making a demand on such a

number of shareholders would be impossible for Plaintiff who has no way of finding out the names,

addresses or phone numbers of shareholders. The cost, time and attempts to comply with possible

federal proxy law application would make the attempt futile.

## SPECIAL PLEADING MATTERS:
## TOLLING OF THE STATUTE OF LIMITATIONS

69.    The Counts alleged herein are timely. As an initial matter, Defendants wrongfully

concealed their manipulation of the stock option plans, through strategic timing and fraudulent

backdating, by issuing false and misleading proxy statements, by falsely reassuring ACS's public

investors that ACS's option grants were being administered by a committee of independent directors,

and by failing to disclose that backdated options were, in fact, actually issued on dates other than

those disclosed, and that strategically timed option grants were issued based on the manipulation of

insider information that ensured that the true fair market value of the Company's stock was, in fact,

higher than the publicly traded price on the date of the option grant.

70.     ACS's public investors had no reason to know of the Defendants' breach of their

fiduciary duties until March 18, 2006, when *The Wall Street Journal* published its article detailing

the option practices of ACS.

71.     Finally, as fiduciaries of ACS and its public shareholders, the Defendants cannot rely

on any limitations defense where they withheld from ACS's public shareholders the facts that give

rise to the claims asserted herein, i.e., that ACS's Board had abdicated its fiduciary responsibilities to

oversee the Company's executive compensation practices, and that the option grant dates had been

manipulated to maximize the profit for the grant recipients and, accordingly, to maximize the costs

for the Company.

## COUNT I

### Violations of §10(b) and Rule 10b-5 of the Exchange Act
### Against All Defendants

72.     Plaintiff incorporates by reference and realleges each and every allegation set forth

above, as though fully set forth herein.

73.     Throughout the relevant period, Defendants individually and in concert, directly and

indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails,

engaged and participated in a continuous course of conduct which allowed certain of the Company's

officers and directors, including some of the Defendants, to receive improper option grants and make

no recompense to the Company.

74.     Defendants employed devices, schemes and artifices to defraud while in possession of

material, adverse non-public information and engaged in acts, practices and a course of conduct that

included the making of, or participation in the making of, untrue and/or misleading statements of

material facts and/or omitting to state material facts necessary in order to make the statements made about ACS not misleading.

75.     Defendants, as top executive officers and directors of the Company, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as officers of the Company, each of the Defendants was able to and did control the conduct complained of herein and the content of the public statements disseminated by ACS.

76.     Defendants acted with scienter throughout the relevant period, in that they either had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.  Defendants were among the senior management of the Company, and were therefore directly responsible for the false and misleading statements and/or omissions disseminated to the public through press releases, news reports and filings with the SEC.

77.     Each of the Defendants participated in a scheme to defraud with the purpose and effect of defrauding ACS.

78.     By virtue of the foregoing, Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### Violations of §14(a) of the Exchange Act
### Against All Defendants

79.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

80.     Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to

state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

81.    The 1995-2005 Proxy Statements violated §14(a) and Rule 14a-9 because they omitted material facts, including the fact that certain of the Defendants were causing ACS to engage in an option backdating scheme, a fact which Defendants were aware of and participated in from at least 1995.

82.    In the exercise of reasonable care, Defendants should have known that the Proxy Statements were materially false and misleading.

83.    The misrepresentations and omissions in the Proxy Statements were material to Plaintiffs in voting on each Proxy Statement. The Proxy Statements were an essential link in the accomplishment of the continuation of Defendants' unlawful stock option backdating scheme, as revelations of the truth would have immediately thwarted a continuation of shareholders' endorsement of the directors' positions, the executive officers' compensation and the Company's compensation policies.

84.    The Company was damaged as a result of the material misrepresentations and omissions in the Proxy Statements.

### COUNT III

#### Violations of §20(a) of the Exchange Act
#### Against the Individual Defendants

85.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

86.    Plaintiff brings this claim against the individual Defendants.

87.    The Defendants named in this Count, by virtue of their positions with ACS and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of ACS within the

meaning of §20(a) of the Exchange Act. They had the power and influence and exercised the same to cause ACS to engage in the illegal conduct and practices complained of herein.

## COUNT IV

### Accounting

88.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

89.    At all relevant times, the Defendants, as directors and/or officers of ACS, owed the Company and its shareholders fiduciary duties of good faith, care, candor and loyalty.

90.    In breach of their fiduciary duties owed to ACS and its shareholders, the Defendants caused ACS, among other things, to grant backdated stock options to themselves and/or certain other officers and directors of ACS and/or failed to properly investigate whether these grants had been improperly made. By this wrongdoing, the Defendants breached their fiduciary duties owed to ACS and its shareholders.

91.    The Defendants possess complete and unfettered control over the improperly issued stock option grants and the books and records of the Company concerning the details of such improperly backdated stock option grants to certain of the Defendants.

92.    As a result of Defendants' misconduct, ACS has been substantially injured and damaged financially and is entitled to a recovery as a result thereof, including the proceeds of those improperly granted options which have been exercised and sold.

93.    Plaintiff demands an accounting be made of all stock options grants made to any of the Defendants, including, without limitation, the dates of the grants, the amounts of the grants, the value of the grants, the recipients of the grants, the exercise date of stock options granted to any of the Defendants, as well as the disposition of any proceeds received by any of the Defendants via sale or other exercise of backdated stock option grants received by those Defendants.

## COUNT V

### Breach of Fiduciary Duty
### Against All Defendants

94.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

95.     Each of the Defendants agreed to and did participate with Defendant Rich, among others, and/or aided and abetted one another in a deliberate course of action designed to divert corporate assets in breach of the fiduciary duties the Defendants owed to the Company.

96.     The Defendants have violated fiduciary duties of care, loyalty, candor and independence owed to ACS and its public shareholders, have engaged in unlawful self-dealing and have acted to put their personal interests and/or their colleagues' interests ahead of the interests of ACS and its shareholders.

97.     As demonstrated by the allegations above, Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, candor and independence owed to ACS and its public shareholders, and they failed to disclose material information and/or made material misrepresentations to shareholders regarding Defendants' option backdating scheme.

98.     By reason of the foregoing acts, practices and course of conduct, the Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward ACS and its public shareholders.

99.     As a proximate result of Defendants' conduct, in concert with Defendants Rich, O'Neill and Rossi, ACS has been injured and is entitled to damages.

## COUNT VI

### Breach of Fiduciary Duty and/or Aiding and Abetting
### Against All Defendants

100.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

101.    As officers and/or directors of ACS, the Defendants participated in the wrongful acts of fraud and mismanagement alleged herein.  They thereby breached their fiduciary duties of care, candor, loyalty and disclosure to ACS shareholders.  They have thus exposed ACS to liability from, *inter alia*, class action suits for violation of the U.S. federal securities laws brought by and on behalf of those persons who purchased ACS's stock during the relevant period as well as investigations launched by the SEC and possibly the Internal Revenue Service ("IRS"), all of which threaten to further cost the Company millions of dollars in fines, penalties and increased professional fees.

102.    Defendants should be required to disgorge any and all gains unjustly obtained at the expense of ACS and its shareholders by way of their fraudulent conduct and breach of their fiduciary duties.

103.    The conduct outlined herein was not due to an honest error of judgment, but rather to the Defendants' bad faith and was done knowingly, willfully, intentionally or recklessly.

104.    By reason of the foregoing, ACS has been damaged.

## COUNT VII

### Abuse of Control
### Against All Defendants

105.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

106.    The Defendants employed the alleged scheme for the purpose of maintaining and entrenching themselves in their positions of power, prestige and profit at, and control over, ACS, and to continue to receive the substantial benefits, salaries and emoluments associated with their positions at ACS.  As a part of this scheme, Defendants actively made and/or participated in the making of or aided and abetted the making of, misrepresentations regarding ACS.

107.    Defendants' conduct constituted an abuse of their ability to control and influence ACS.

108.   By reason of the foregoing, ACS has been damaged.

## COUNT VIII

### Gross Mismanagement
### Against All Defendants

109.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

110.   Defendants had a duty to ACS and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of ACS.

111.   Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of ACS in a manner consistent with the duties imposed upon them by law.   By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of ACS's affairs and in the use and preservation of ACS's assets.

112.   During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused ACS to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to ACS, thus breaching their duties to the Company.   As a result, Defendants grossly mismanaged ACS.

113.   By reason of the foregoing, ACS has been damaged.

## COUNT IX

### Constructive Fraud
### Against All Defendants

114.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

115.   As corporate fiduciaries, Defendants owed to ACS and its shareholders a duty of candor and full accurate disclosure regarding the true state of ACS's business and assets and their conduct with regard thereto.

116.   As a result of the conduct complained of, Defendants made, or aided and abetted the making of, numerous misrepresentations to and/or concealed material facts from ACS's shareholders despite their duties to, *inter alia*, disclose the true facts regarding their stewardship of ACS.  Thus they have committed constructive fraud and violated their duty of candor.

117.   By reason of the foregoing, ACS has been damaged.

### COUNT X

### Corporate Waste
### Against All Defendants

118.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

119.   By failing to properly consider the interests of the Company and its public shareholders, by failing to conduct proper supervision, by giving away millions of dollars to Defendants via the option backdating scheme, and by enabling Defendant Rich to unjustly gain approximately $18.4 million in his separation agreement, Defendants have caused ACS to waste valuable corporate assets.

120.   As a result of Defendants' corporate waste, they are liable to the Company.

### COUNT XI

### Unjust Enrichment
### Against All Defendants

121.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

122.    As a result of the conduct described above, Defendants will be and have been unjustly enriched at the expense of ACS, in the form of unjustified salaries, benefits, bonuses, stock option grants and other emoluments of office.

123.    All the payments and benefits provided to the Defendants were at the expense of ACS.  The Company received no benefit from these payments.  ACS was damaged by such payments.

124.    Certain of the Defendants sold ACS stock for a profit during the period of deception, misusing confidential non-public corporate information.  These Defendants should be required to disgorge the gains which they have and/or will otherwise unjustly obtain at the expense of ACS.  A constructive trust for the benefit of the Company should be imposed thereon.

### COUNT XII

**Against Defendants Rich, Deason, Blodgett, King, Edwards, Rexford, and Brophy for Rescission**

125.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

126.    As a result of the acts alleged herein, the stock option contracts between Defendants and ACS entered into during the relevant period were obtained through Defendants' fraud, deceit, and abuse of control.  Further, the backdated stock options were illegal grants and thus invalid as they were not authorized in accordance with the terms of the publicly-filed Company stock option plans which were approved by ACS shareholders and filed with the SEC.

127.    All contracts which provide for stock option grants between Defendants and ACS and were entered into during the relevant period should, therefore, be rescinded, with all sums paid under such contracts returned to the Company, and all such executory contracts cancelled and declared void.

## COUNT XIII

### Against Defendants Rich, Deason, King, Blodgett, Edwards, Rexford And Brophy for Breach of Contract

128.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

129.    As a result of the backdating of options granted to them, Defendants Rich, Deason, Blodgett, King, Edwards, Rexford, and Brophy have breached their employment agreements with ACS and violated the Company's stock option plans, all of which provide that the exercise price of all of the stock options would be no less than the fair market value of the Company's common stock, measured by the publicly traded closing price for ACS stock, on the date of the grant.

130.    ACS and its shareholders have been damaged by Defendants Rich, Deason, Blodgett, King, Edwards, Rexford, and Brophy's breach of contract.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.      Against all of Defendants and in favor of ACS for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties, waste of corporate assets, gross mismanagement, and unjust enrichment;

B.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and statutory provisions sued hereunder, including disgorging, attaching, impounding, imposing a constructive trust on or otherwise restricting the value of improvidently granted stock options and/or the proceeds of Defendants' trading activities or their other assets so as to assure that Plaintiff on behalf of ACS has an effective remedy;

C.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, and accountants' and experts' fees, costs, and expenses; and

D.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  June 22, 2006

PROVOST & UMPHREY LAW FIRM, LLP
JOE KENDALL
State Bar No. 11260700
WILLIE C. BRISCOE
State Bar No. 24001788

*Joe Kendall by permission*

JOE KENDALL

3232 McKinney Avenue, Suite 700
Dallas, TX  75204
Telephone:  214/744-3000
214/744-3015 (fax)

LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
MARIO ALBA JR.
58 South Service Road, Suite 200
Melville, NY 11747
Telephone:  631/367-7100
631/367-1173 (fax)

Attorneys for Plaintiff

## VERIFICATION

I, DAVID A. ROSENFELD, hereby declare as follows:

1.      I am counsel for plaintiff in the above-entitled action.  I have read the foregoing complaint and know the contents thereof.  I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

2.      I make this Verification because plaintiff is absent from the County of Suffolk where I maintain my office.

Executed this 21st day of June, 2006 at Melville, NY.


_____
DAVID A. ROSENFELD

JS 44   (Rev 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Alaska Electrical Fund, Derivatively on Behalf of Affiliated Computer Services, Inc.

**RECEIVED**

**DEFENDANTS**

Jeffrey Rich, Joseph P. O'Neill, Frank A. Rossi, Darwin Deason, Mark King, Lynn Blodgett, J. Livingston Kosberg, Dennis McCuistion, et al

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U S PLAINTIFF CASES)

JUN 2 2 2006

County of Residence of First Listed Defendant   Dallas, Texas
(IN U S PLAINTIFF CASES ONLY)
NOTE   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED

**(c)** Attorney's (Firm Name, Address, and Telephone Number)   CLERK, U.S. DISTRICT COURT   Attorneys (If Known)
Joe Kendall, Provost Umphrey Law Firm, 3232 McKinney Avenue,   NORTHERN DISTRICT OF TEXAS
Suite 700, Dallas Texas 75204

**3-06CV1110-M**

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

| | |
|---|---|
| ☐ 1 U S Government Plaintiff | ☒ 3 Federal Question (U.S. Government Not a Party) |
| ☐ 2 U S Government Defendant | ☐ 4 Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)   and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R R & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 190 Other Contract | | | ☐ 720 Labor/Mgmt Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl Ret Inc Security Act | ☐ 870 Taxes (U S Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

| | | | | | | Appeal to District |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Judge from Magistrate Judgment |

## VI. CAUSE OF ACTION

Cite the U S Civil Statute under which you are filing (**Do not cite jurisdictional statutes unless diversity**)
_____
Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☐ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions)   JUDGE _____   DOCKET NUMBER _____

DATE   6/22/06

SIGNATURE OF ATTORNEY OF RECORD   *Joe Kendall by permission*

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG JUDGE _____